## CHICK BLANTON v. STATE.

No. A-6090. Opinion Filed Sept. 24, 1927.

(259 Pac. 655.)

150

A. W. Turner, for plaintiff in error.

Edwin Dabney, Atty. Gen., and J. H. Lawson, Asst. Atty. Gen., for the State.

EDWARDS, J. The plaintiff in error, hereinafter called defendant, was convicted in the county court of Ottawa county on a charge of maintaining a public nuisance and was sentenced to pay a fine of $100 and to serve 30 days in the county jail.

The information charges in substance that defendant maintained and operated a public dance hall as a

nuisance at a concrete block building, formerly a bottling works, so as to annoy, injure, and endanger the comfort and safety and to offend the decency of the neighborhood. The record discloses that defendant operated and maintained a public dance hall on the road between Cardin and Picher in the building described, at which there gathered a large crowd of men and women of a rough character. That vulgar talk, cursing, blackguarding, drinking on the part of some of those attending the dance and loitering in and around where it was being conducted was common; that women from the dance hall retired away from the building for lewd purposes—all to the annoyance and offense of the neighborhood. Excerpts from the evidence of several different witnesses show the following state of facts:

"* * * Q. What did you see as to the manner in which the dance, or around the dance was being conducted on this occasion? A Well, I don't know; I know as to the crowd, I would call it a pretty rough crowd.

"Q. What would you say as to the talk and so forth? A. Well; nothing unusual to hear vulgar talk.* * *.

"Q. I don't know how far back that lot goes.

"Q. You were with whom that night? A. Mr. Simpson and Mr. Lucky.

"Q. How far away from that dance hall did you hear that vulgar and loud talking? A. Well, the crowd was there, some of them standing clear back to 30 or 40 steps from there.

"Q. Did you arrest those people who were making that talk? A. No, sir.

"Q. Why? A. Because I couldn't tell who it was; fellow threw a whisky bottle through a windshield and went out to see who it was and couldn't find out that.

"Q. How long is that dance hall? A. About 50 feet.

"Q. Do you know the length of those lots out there? A. No, sir.

"Q. That was to the rear of the dance hall? A. Yes, sir.

"Q. Now, where was this arrest made? A. The only arrest I made was arresting this man here.

"Q. Was he misconducting himself at that time? A. No; I wouldn't say he was.

"Q. He was there running that dance? A. Yes, sir.

"Q. What kind of a manner was they talking in? A. Well; you could hear cussing there and blackguarding in there. * * *

"Q. At the time or any time you were there, I will ask you, and you may state if you know, whether or not you saw any drunk person or persons under the influence of liquor in the dance hall. A. Well, I seen people that I would say were intoxicated.

"Q. And where were they, Mr. Warner? A. Some of them were dancing and some of them mingling around the crowd. * * *

"Q. I will ask you whether or not there was anything peculiarly wrong with the crowd? A. Well; I have arrested quite a number out there.

"Q. Men or women? A. Well, mostly men and some women.

"Q. What did you arrest them for, Mr. Anderson? A. Well; I arrested men for being drunk, and I arrested women outside the building.

"Q. How far from the building? A. Well; about 100 yards. * * *

"Q. Now these women you arrested about a hundred yards from this dance hall, had you seen them in the dance hall at—? A. Yes; they had been dancing.

"Q. And they had gone out about a hundred yards from the building? A. Yes, sir.

"Q. For what did you arrest them? * * *

"Q. You don't know?    A. Well; I know. but I don't want to say.

"Q. Was it lewd conduct or indecency?    A. Yes.

"Q. Now, when these women left would men go with them?    A. Yes.

"Q. After they left would they later return to the dance hall?    A. Yes; they would go out to the car and sit in them awhile and then come back to the dance hall.

"Q. How many men would you say you have arrested in there, Mr. Anderson, for being drunk or intoxicated?    A. Well, I guess a dozen or more; he would ask us many times when a man was drunk  to  take  them away. * * *

"Q. Do you know how these people had come up there.    A. They come out of the dance hall—saw them come out of the dance hall with two boys, and the boys had a couple of bottles of pop.

"Q. Do you know where they bought that pop?    A. Well; in front I guess.

"Q. They sell pop there?    A. Yes, sir; and they went out on behind the car, and the boys had a half pint of whisky, and they passed the bottle around, and I made a run and got the bottle; it was whisky.

"Q. What other arrests did you make out there? A. Arrested a boy and girl for lewd conduct.

"Q. Where were they arrested?    A. Well; hundred or hundred twenty-five feet west of the building.

"Q. I will ask you whether or not you had seen them at the time?    A. I did—saw the woman come out of the dance hall. * * *

"Q. Your feeling for this man is not particularly kind, is it, and hasn't been for some time?    A. Not since his wife got out there and cussed me one time and threatened to throw a hammer at us; said, 'you big son-of-a-bitch, we are going to stomp your brain out if you don't stop interfering with our business.'

"Q. Now, these men that were out in front of this

house out there cussing, you don't know whether they had been at the dance or not, do you? A. Yes, sir; I saw them come from there. * * * A. Well, one particular night—first they parked their cars in front of our house there and there was two couples came from the dance hall and they was in some kind of an argument about where they would go to, and I heard what one girl said, she said, 'this God damned hole we are in—let's go to Quapaw.'

"Q. What was further said? A. This girl said, 'We don't know where we will go.'

"Q. Who was with these two women. A. Two men.

"Q. What else did you see or hear there on any dance nights? A. Well; just heard yelling and the noise and the cursing and the cars leaving all the time.

"Q. How late in the night would this continue. A. Well; I couldn't swear that because I didn't get up to see; one night it was 11 o'clock I know.

"Q. On any other occasion I will ask you whether or not you heard any loud talking or anything—ever see any fights? A. No, sir.

"Q. Ever hear any men fighting? A. I have heard them cussing over there, but I couldn't say whether it was a fight or who it was.

"Q. I believe you testified you live three doors south of the dance hall and you heard them cussing down at your place? A. Yes, sir.

"Q. On how many occasions did you hear that? A. Three or four times.

"Q. And that was on a dance night? A. Yes, sir.

"Q. Was that the voice of men or women? A. Sometimes men and once a woman. * * *"

There is considerable other evidence of the same general nature in proof of conduct even more offensive, which demonstrates the character of the place and the manner in which it was conducted.

Sections 7870, 7871, and 1958, Comp. St. 1921, define a nuisance as follows:

"A nuisance consists in unlawfully doing an act, or omitting to perform a duty, which act or omission either:

"First. Annoys, injures or endangers the comfort, repose, health, or safety of others; or,

"Second. Offends decency.; or,

"Third. Unlawfully interferes with, obstructs or tends to obstruct, or renders dangerous for passage, any lake or navigable river, stream, canal or basin, or any public park, square, street or highway; or,

"Fourth. In any way renders other persons insecure in life or in the use of property.

"A public nuisance is one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon the individuals may be unequal."

"Any person who maintains or commits any public nuisance, and the punishment for which is not otherwise prescribed, or who willfully omits to perform any legal duty relating to the removal of a public nuisance, is guilty of a misdemeanor."

The defendant contends he is not responsible for any misconduct that took place outside of the building in which the dance was conducted; that the admission of such evidence was prejudicial; that since the information charges the nuisance at a particular building, the scope of the inquiry is limited to the building—citing 29 Cyc. p. 1285, par. 720, and 20 R. C. L. p. 486, par. 99.

In a prosecution for maintaining a public nuisance, it is not necessary that the information designate the particular place of the commission of the offense other than to charge it to have been committed in the county. That is, the rule of pleading is no more definite in charg-

ing a nuisance than in charging any other offense under the statute. However, it is not improper to charge the offense to have been committed at a particular designated place, and when so charged an independent nuisance committed at some other place will not sustain the charge. A material variance between the allegation and the proof in this respect would be fatal. This means no more, however, than saying that where one offense is charged in an information a conviction cannot be had by proof of another offense. State v. Kelly, 22 N. D. 5, 132 N. W. 223, Ann. Cas. 1913E, 974.

Under these provisions of the statute and the evidence, it is apparent that the dance hall and its environs was a public nuisance of an outrageous character. A dance hall is not per se a nuisance, but may become such by the manner in which it is conducted and by the conduct of the persons assembled in and around it. The proof is not restricted to what occurs within the building at which the nuisance is charged to be maintained, but acts constituting a nuisance and having an evident connection and relation to the offensive matter charged as a nuisance occurring adjacent to and about the building 'so near as to constitute a part of the nuisance charged are competent. The fact that those who gathered at this place at the invitation of defendant did not commit all their offensive acts within the building but a number of them were committed outside does not preclude the state from offering testimony of what occurred outside, where it is shown that those guilty of the offensive acts gathered at and about the dance hall as spectators and participants. When that was shown the evidence was competent and while in each instance the proof may not have been specifically offered that the offensive acts were committed by spectators and participants gathered at the dance, sufficient was shown on this point to ren-

der the other evidence on the same point not connected inconsequential error.

The case is affirmed.

DOYLE, P. J., concurs.

DAVENPORT, J., absent, not participating.